STATE OF NORTH CAROLINA v. BLANCHE KISER TAYLOR MOORE

No. 556A90

(Filed 4 March 1994)

1. **Criminal Law § 78 (NCI4th) — murder — pretrial publicity — change of venue denied — no error**

   The trial court did not err by denying defendant's motions for a change of venue in a first-degree murder prosecution where three of the thirty-three articles submitted contained potentially exculpatory information; only one was potentially inflammatory and defendant made no showing concerning the extent of its circulation; the remaining twenty-nine articles were primarily factually based; and each of the twelve jurors who ultimately served on the jury stated unequivocally during the initial screening process and again during *voir dire* that they had formed no opinions about the case, could be fair and impartial, and would base their decisions solely on the evidence presented at trial. N.C.G.S. § 15A-957.

   **Am Jur 2d, Criminal Law § 378.**

2. **Indictment, Information, and Criminal Pleadings § 41 (NCI4th) — first-degree murder — poisoning — motion for a bill of particulars denied — no error**

   The trial court did not err in a first-degree murder prosecution involving poisoning by denying defendant's motions for a bill of particulars where the State provided defense counsel with copies of the victim's entire medical record along with the autopsy report and reports detailing the results of hair analysis, which enabled defendant to determine the time frame when the victim's body contained elevated levels of arsenic; the State at trial did not attempt to adduce any evidence indicating the timing of the poisonings with any greater particularity than reflected in the documentation furnished to defendant covering the period from "December 31, 1985 through October 7, 1986"; defendant does not suggest surprise or specify the manner in which the denial of her motions affected her trial strategy; the State introduced nothing at trial which could have come as a surprise to the defendant pertaining to the dates of the poisonings; and defendant had full knowledge

STATE v. MOORE

[335 N.C. 567 (1994)]

of the specific occurrences to be investigated at trial. N.C.G.S. § 15A-925.

**Am Jur 2d, Indictments and Informations §§ 159 et seq.**

3. **Criminal Law § 107 (NCI4th) — first-degree murder — open file policy — case transferred — not applicable**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion to compel the Forsyth County District Attorney to abide by the prior agreement between defendant and the Alamance County District Attorney for an open file policy. While the prosecutor may proceed under an open file policy, he or she may not be forced to do so and the District Attorney in one district may not be compelled to comply with an agreement pertaining to discovery entered into by the District Attorney in another district once venue has been changed in the case. Furthermore, defendant did not show any prejudice resulting from the Forsyth District Attorney's refusal to follow an open file policy. N.C.G.S. § 15A-904.

**Am Jur 2d, Depositions and Discovery §§ 428 et seq.**

4. **Jury § 113 (NCI4th) — first-degree murder — jury selection — individual voir dire denied — no error**

The trial court did not abuse its discretion in a first-degree murder prosecution by denying defendant's motion for individual sequestered *voir dire* of prospective jurors. Defendant's argument that collective *voir dire* inhibited the candor of the jurors and permitted prospective jurors to become educated concerning responses which would enable them to be excused from the panel is speculative, without merit, and not supported by the record.

**Am Jur 2d, Jury § 197.**

5. **Jury § 141 (NCI4th) — first-degree murder — jury selection — eligibility for parole — questions not allowed — no error**

The trial court did not err in a first-degree murder prosecution by denying defendant's motion that prospective jurors be examined on their opinions concerning defendant's eligibility for parole upon conviction.

**Am Jur 2d, Jury § 197.**

6. **Jury § 96 (NCI4th)— first-degree murder—jury selection—initial screening by judge—no abuse of discretion**

The trial court did not abuse its discretion in a first-degree murder prosecution by conducting the *voir dire* during the initial screening process where the court initially allowed the State and the defendant to screen the first thirteen prospective jurors concerning pretrial publicity but then took over and conducted the remainder of the screening process after several admonitions to counsel to speed up the questioning; the judge directed four questions concerning pretrial publicity and the presumption of innocence to each prospective juror; the prospective juror was either excused for cause upon motion by defendant or asked to return the following day for the continuation of the standard *voir dire*; and defense counsel was permitted on several occasions to follow up on the questions previously asked by the court. N.C.G.S. § 15A-1214(c).

**Am Jur 2d, Jury §§ 195 et seq.**

7. **Evidence and Witnesses § 365 (NCI4th)— first-degree murder—poisoning—other occurrences—admissible**

The trial court did not err in a first-degree murder prosecution involving poisoning by denying defendant's motion *in limine* to restrict introduction by the State of evidence concerning the deaths of defendant's father and first husband and the illness of her last husband where three different men either married to or intimately involved with defendant died or barely escaped death from arsenic poisoning, an unusual cause of death; defendant had motive (financial), opportunity (close relationship), and means (knowledge of and access to Anti-Ant) in each case; in each case medical evidence suggests that multiple doses of arsenic were administered to the victim over a long period of time, as opposed to one large fatal dose; defendant was frequently alone with the victim in the hospital in each case, and medical testimony suggests that certain of defendant's visits in which she fed the victim corresponded with an onset of symptoms characteristic of arsenic poisoning; defendant was heard to say in each case that she hated the victim or that the victim was cruel or evil; and, in the cases of this victim and her first husband, defendant was already seeing her next victim at the time of the arsenic assaults. Given the similarities between the crime charged and the other

**STATE v. MOORE**

[335 N.C. 567 (1994)]

crimes presented by the State, the evidence of the other offenses was relevant under N.C.G.S. § 8C-1, Rule 404(b) as evidence tending to prove *modus operandi*, motive, opportunity, intent and identity of defendant as the perpetrator.

**Am Jur 2d, Homicide § 310.**

8. **Evidence and Witnesses § 223 (NCI4th) — first-degree murder — medical techniques and equipment for victim — admissible**

The trial court did not err in a first-degree murder prosecution involving poisoning by allowing the State to introduce testimony from a registered nurse who had cared for the victim during his final illness concerning medical techniques and medical equipment used to treat the victim. Although defendant contended that the sole purpose of the testimony was to generate sympathy for the victim's family, the testimony was probative to show that defendant had access to the victim in the hospital, that a correlation existed between defendant's feeding the victim and the onset of his symptoms, that the victim manifested symptoms associated with multiple system failure incident to arsenic poisoning, that the victim could swallow food notwithstanding the tubes, that arsenic could have been introduced into the victim's body via the feeding tubes, and that the victim suffered inordinate pain over an extended period of time. The probative value of the testimony outweighed any unfair prejudice to defendant; furthermore, the record discloses that similar evidence from other witnesses was admitted without objection.

**Am Jur 2d, Evidence §§ 280 et seq.**

9. **Criminal Law § 473 (NCI4th) — first-degree murder — emotional display by prosecutor — no mistrial — no error**

The trial court did not abuse its discretion in a first-degree murder prosecution by denying defendant's motion for a mistrial where the prosecutor burst into tears and after some 30 seconds fled the courtroom, but the prosecutor removed herself from the courtroom quickly and quietly, the jury was immediately removed from the courtroom, and, in response to questions by the court, not one juror answered that the incident would prevent him or her from being able to give defendant a completely fair and impartial verdict based solely on the evidence.

The Assistant District Attorney's brief emotional display was not prejudicial to defendant.

**Am Jur 2d, Trial § 194.**

10. **Criminal Law § 107 (NCI4th)— first-degree murder— discovery—review of files to determine compliance—no ex mero motu obligation**

The trial court did not err in a first-degree murder prosecution by failing to conduct a *voir dire* examination of the District Attorney's files to determine whether the State had complied with discovery where defendant asked for an *in camera* inspection of a disputed report to determine if it was a discoverable statement rather than an *in camera* examination of the prosecutor's file to determine if the District Attorney had provided discovery as required. The trial court is under no obligation *ex mero motu* to examine the prosecutor's investigative files for discovery compliance.

**Am Jur 2d, Depositions and Discovery §§ 428 et seq.**

11. **Evidence and Witnesses § 1497 (NCI4th)— first-degree murder—poisoning—Anti-Ant—not same bottle used in poisoning—admissible**

The trial court did not err in a first-degree murder prosecution involving poisoning by admitting into evidence a bottle of Anti-Ant even though it was not the bottle used to poison the victim. The identification of the bottle of Anti-Ant was not irrelevant; the State's evidence tended to prove that defendant was familiar with the product as early as the 1970's; that the product was available in the Burlington area at all relevant times; and that defendant actually had a bottle of Anti-Ant in her possession during the summer of 1985, which she showed to her current husband with the request that he purchase another bottle.

**Am Jur 2d, Homicide § 414.**

12. **Evidence and Witnesses § 1548 (NCI4th)— first-degree murder—poisoning—medical devices—admissible**

The trial court did not err during a first-degree murder prosecution involving poisoning by admitting into evidence medical devices which defendant contended were used merely to inflame the passions of the jury. The medical devices were

identified and introduced solely to illustrate the testimony of a registered nurse involved in the victim's primary care and treatment, the pieces of equipment were not excessively displayed and were not presented separately to the jury for a closer inspection, and the probative value of the evidence substantially outweighed the possibility of any unfair prejudice to defendant. N.C.G.S. § 8C-1, Rule 403.

**Am Jur 2d, Evidence §§ 771 et seq.**

**13. Homicide § 259 (NCI4th) — first-degree murder — poisoning — evidence sufficient**

There was sufficient evidence to submit first-degree murder by poisoning to the jury even though no poison was ever positively placed in defendant's hands where there was sufficient competent evidence from which a reasonable juror could find beyond a reasonable doubt that the victim, Reid, died from arsenic poisoning administered by defendant through a series of repeated doses; defendant had possessed, attempted to purchase, or asked someone else to purchase an arsenic based ant killer on at least three occasions; all three of the men who were either married to or romantically involved with defendant died or nearly died as a result of arsenic poisoning; defendant expressed negative feelings about Reid to her psychiatrist and stated that her feelings toward Reid had turned to hate; the State presented evidence that defendant had taken food to Reid in the hospital; and the medical evidence demonstrated a correlation between defendant's visits and the renewed onset of Reid's symptoms.

**Am Jur 2d, Homicide § 443.**

**14. Criminal Law § 762 (NCI4th) — first-degree murder — instructions — reasonable doubt**

The trial court did not err in refusing to give defendant's requested instruction on reasonable doubt in a first-degree murder prosecution where the pattern instruction given by the trial court contained none of the offending phrases under *Cage v. Louisiana*, 498 U.S. 39, namely, "grave uncertainty," "actual substantial doubt," and "moral certainty," or terms of similar import. Furthermore, this instruction correctly informed the jury that the standard for conviction beyond a

reasonable doubt was certainty based upon the sufficiency of the evidence.

**Am Jur 2d, Trial § 832.**

15. **Criminal Law § 763 (NCI4th)— first-degree murder— instructions—identity of perpetrator—circumstantial evidence —no error**

The trial court did not err in a first-degree murder prosecution by refusing to instruct the jury on the identity of the individual responsible for the victim's death as requested by defendant where the court met the requirement of giving the requested instruction in substance in that the instruction as given, when read in conjunction with the entire charge to the jury, adequately linked the State's burden to prove defendant's identity as the perpetrator of the crime with the quantum of proof beyond a reasonable doubt.

**Am Jur 2d, Trial §§ 843 et seq.**

**Modern status of rule regarding necessity of instruction on circumstantial evidence in criminal trial—state cases. 36 ALR4th 1046.**

16. **Evidence and Witnesses § 983 (NCI4th)— first-degree murder— instructions—dying declarations**

The trial court did not err in a first-degree murder prosecution by not giving defendant's requested instruction on dying declarations where the State contended that there was no evidence showing that the letter was even written by the purported author, Garvin Thomas; defendant's own expert refused to opine that Thomas authored the letter while the State's expert, a questioned documents examiner and forensic chemist, ruled out Thomas as the author to a ninety-nine percent degree of certainty; and the letter was offered into evidence by the State not as the dying declaration of Garvin Thomas but as evidence of defendant's "deceptive plan to throw suspicion away from herself." The court properly instructed the jury on the issue of credibility of the evidence.

**Am Jur 2d, Homicide §§ 347 et seq.**

**Admissibility in criminal trial of dying declarations involving an asserted opinion or conclusion. 86 ALR2d 905.**

STATE v. MOORE

[335 N.C. 567 (1994)]

**17. Criminal Law § 687 (NCI4th) — first-degree murder — requested instructions denied — given essentially verbatim**

There was no error in a first-degree murder prosecution where the trial court denied defendant's requested instruction pertaining to uncontradicted evidence but gave the requested charge essentially verbatim.

**Am Jur 2d, Trial §§ 588 et seq.**

**18. Homicide § 557 (NCI4th) — first-degree murder — poisoning — instruction on second-degree murder refused — no error**

The trial court did not err in a first-degree murder prosecution arising from a poisoning by refusing to submit the lesser included offense of second-degree murder to the jury. Although defendant argued that the court, in effect, allowed the jury to presume premeditation and deliberation and relieved the State of its burden of proof, any murder committed by means of poison is automatically first-degree murder. The evidence here supported every element of first-degree murder by poisoning.

**Am Jur 2d, Homicide §§ 525 et seq.**

**19. Criminal Law § 1318 (NCI4th) — first-degree murder — sentencing — requested instruction on reasonable doubt — not given in guilt stage — no error in sentencing stage**

There was no error in the sentencing stage of a first-degree murder prosecution where the court had failed to give defendant's requested instruction on reasonable doubt in the guilt-innocence phase of the trial. This assignment of error would be without merit even if defendant had properly preserved it for appellate review.

**Am Jur 2d, Trial §§ 888 et seq.**

**20. Criminal Law § 1326 (NCI4th) — first-degree murder — sentencing — instructions — reasonable doubt — application to mitigating circumstances**

The trial court did not err during a sentencing proceeding for first-degree murder by not explaining to the jury that the standard of beyond a reasonable doubt applies to mitigating circumstances as well as to aggravating circumstances. Defendant's contention is an incorrect statement of law.

**Am Jur 2d, Trial §§ 888 et seq.**

STATE v. MOORE

[335 N.C. 567 (1994)]

21. **Criminal Law § 1341 (NCI4th)— first-degree murder— sentencing—aggravating circumstance—pecuniary gain**

The trial court did not err in the sentencing portion of a first-degree murder prosecution by submitting the aggravating circumstance of pecuniary gain where the evidence would permit a rational juror to find beyond a reasonable doubt that the murder was committed for the purpose of pecuniary gain. Although defendant contended that this circumstance should be submitted only when the primary motivation is financial gain, that assertion is not supported by the law. N.C.G.S. § 15A-2000(e)(6).

**Am Jur 2d, Criminal Law §§ 598 et seq.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like—post-Gregg cases. 66 ALR4th 417.**

22. **Criminal Law § 1344 (NCI4th)— first-degree murder— poisoning—sentencing—aggravating circumstances—especially heinous, atrocious, or cruel**

The trial court properly submitted the aggravating circumstance that a poisoning death was especially heinous, atrocious, or cruel where defendant contended that the circumstance should not have been submitted since arsenic has an inherent propensity to inflict a prolonged and painful period of suffering prior to death. The fact that the poison is administered in small doses over an extended period of time thereby causing excruciating and prolonged pain and suffering is not essential to prove the offense, nor is the type poison chosen, be it a slow acting or fast acting agent, an element of the offense. The holding in State v. Cherry, 298 N.C. 86, is specifically confined to felony-murder cases and the rationale of the case is not applicable to poisoning deaths. N.C.G.S. § 15A-2000(e)(9).

**Am Jur 2d, Criminal Law §§ 598 et seq.**

23. **Criminal Law § 1373 (NCI4th)— first-degree murder—death sentence—not disproportionate**

There was no proportionality error in a death sentence for a first-degree murder by poisoning where the record sup-

ports the jury's finding of the aggravating circumstances on which the sentence was based; the sentence was not imposed under the influence of passion, prejudice, or any other arbitrary fact; and the sentence was not disproportionate to the penalty imposed in similar cases, considering both the crime and defendant.

## Am Jur 2d, Criminal Law § 628.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Freeman, J., at the 15 October 1990 Criminal Session of Superior Court, Forsyth County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 16 February 1993.

*Michael F. Easley, Attorney General, by Barry S. McNeill, Special Deputy Attorney General, for the State.*

*David F. Tamer and Lisa S. Costner for defendant-appellant.*

PARKER, Justice.

Defendant, Blanche Kiser Taylor Moore, was indicted for the 7 October 1986 first-degree murder of Raymond C. Reid, Sr. (herein "Reid"). She was tried capitally at the 15 October 1990 Criminal Session of Superior Court, Forsyth County, and was found guilty as charged. Following a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended defendant be sentenced to death. Judgment of death was entered on 16 November 1990. An order staying execution of the death sentence was entered on 26 November 1990 pending the conclusion of this appeal.

In May of 1989, defendant's then husband, the Reverend Dwight D. Moore (herein "Moore"), while being treated at North Carolina Memorial Hospital in Chapel Hill, North Carolina, was diagnosed with arsenic poisoning. An investigation was begun which led to the eventual exhumation of the bodies of P.D. Kiser, Sr., defendant's father; James N. Taylor, defendant's first husband; and Reid, a previous boyfriend. All of the bodies tested positively for the presence of arsenic. Defendant was indicted in Alamance County for the murders of Kiser and Taylor and the felonious assault on Moore; she was indicted in Forsyth County for the murder of Reid. The Alamance County cases were subsequently transferred

to Forsyth County. This opinion reviews defendant's capital trial for the murder by arsenic poisoning of Reid.

The State's evidence at trial tended to show that defendant met Reid while working at Kroger supermarket in Burlington, North Carolina, in 1962. They did not start going out together, however, until 1979. According to the testimony of a Kroger risk management investigator, Reid had said he and defendant "probably would have been married, except she wanted to be there next to her family." Reid was transferred several times in 1979 and 1980 until he became manager of a store in Winston-Salem, North Carolina. Defendant worked the entire time in Burlington except for a brief period in 1979 when she was at a store in Durham. Defendant last worked at Kroger 17 October 1985, when she left her employment on account of sexual harassment.

Reid initially became ill on 1 January 1986. After having spent New Year's Eve with defendant and having eaten some of her homemade potato soup, Reid began experiencing severe symptoms of nausea, vomiting, and diarrhea. Reid, who had never been known to miss work, was absent from work more than four weeks over the next few months. His last day at work was 29 May 1986. Reid's condition became progressively worse; and he was admitted to Wesley Long Hospital in Greensboro, North Carolina, on 30 May 1986 by his physician, Dr. Norman H. Garrett, Jr. On admission, Reid reported to Dr. Garrett that while eating supper seven days earlier, he had experienced nausea, vomiting, and dehydration, that he had become violently ill, and that he had been unable to keep down any solid foods since that time. Dr. Garrett's admission diagnosis was acute gastroenteritis based on "his profound dehydration, nausea and vomiting."

While hospitalized, Reid's condition continued to deteriorate; and Dr. Garrett revised his diagnosis to multiple systems failure based on Reid's symptoms including excessive nausea and vomiting, loose stools, skin rash, edema, dehydration, bone marrow damage, blood cell abnormalities, electrolyte abnormality, tachypnea (progressive shortness of breath), respiratory failure, tachycardia (fast heartbeat), low blood pressure, kidney malfunction and shutdown, and numbness and tingling in his hands and feet. Each of these symptoms is characteristic of arsenic poisoning.

By the morning of 5 June 1986, Reid's condition had stabilized. Dr. Garrett informed Reid, in defendant's presence, that he need

only remain in the hospital for three to five more days following his circumcision (the procedure was the result of an infection and was not related to Reid's other symptoms). However, Reid's condition worsened so much over the next week that it became "life threatening," and Dr. Garrett transferred him to North Carolina Baptist Hospital in Winston-Salem on 13 June 1986. Dr. Garrett was never able to make a satisfactory diagnosis of the cause of Reid's multi-system failures.

Dr. Robert Hamilton, a specialist in internal medicine and nephrology who treated Reid at Baptist Hospital, testified that Reid was admitted with a number of symptoms, including a raspy voice, severe swelling in his lower extremities, anemia, low white blood cell count, a rash over his lower extremities, white patches in his mouth, very poor bowel sounds, difficulty breathing, and signs of kidney failure. Reid's condition continued to deteriorate, resulting in a "Code Blue" on 21 June 1986. Emergency measures were taken and Reid was intubated so that he could be mechanically ventilated. Over the next few days, Reid became nearly paralyzed.

Dr. Hamilton began with a preliminary diagnosis of Guillain-Barre syndrome. Reid showed some slight improvement following a procedure called "plasmapheresis." In this procedure, the patient's blood is removed from the body, the red blood cells are separated from the plasma, and the red blood cells are returned to the body. The lab report from a urine sample obtained from Reid between 27 June 1986 and 28 June 1986 showed "quite elevated" levels of arsenic in the urine. Dr. Hamilton, however, never saw the results of this test. Reid further improved during July of 1986 but continued to have difficulty breathing and needed to be on a respirator. Reid gradually recovered use of his extremities and was able to breathe on his own. During this time, defendant asked Dr. Hamilton if she could bring food from home for Reid and was given permission to do so. At the end of September, Reid suffered another serious setback.

Lisa Hutchens, the head nurse in the Intensive Care Unit (ICU), testified that the last time she saw Reid looking well was on 1 October 1986 when she visited him in the intermediate care unit. Defendant was with Reid and was feeding him banana pudding. Hutchens again visited Reid on 3 October 1986 in his room in the intermediate ward. Reid was in "acute respiratory distress" and was very frightened. He pleaded with her to "[p]lease help

me or I'm going to die." Reid was returned to the ICU on 4 October 1986. Nurse Hutchens recalled defendant often bringing Reid food items from home such as iced tea, frozen yogurt, milk shakes, and soups during this time.

Steven Reid, one of Reid's sons, testified that he visited his father on 4 October 1986 and found he had eaten a breakfast prepared by defendant. He stayed until late that afternoon and visited again on the fifth before returning to East Carolina University in Greenville, North Carolina. When Steve called on Monday, 6 October 1986, defendant informed him he should return to the hospital as soon as possible. When he arrived on the evening of the sixth, he hardly recognized his father. He looked as if he had gained almost one hundred pounds and "[h]is eyeballs were even starting to swell and his skin was splitting."

Dr. Kyle Jackson testified that Reid became "progressively weaker and unable to continue his breathing on his own well enough to sustain life." By 7 October 1986, Reid was on inotropic drugs and mechanical ventilation. He was able to communicate only with his eyes. In the early afternoon, Reid "coded" and the responding medical personnel began to administer CPR and to perfuse his heart in order to give him emergency drugs. Dr. Jackson pronounced Reid dead from complications which he thought were attributable to Guillain-Barre syndrome. Several witnesses recalled that moments after Reid passed away defendant stated: "We cannot have an autopsy. He has been through too much. He wouldn't want to be cut on like this. We just—we cannot have one."

Several hospital employees, family members, and visitors testified that they recalled defendant bringing Reid milk shakes from McDonald's while he was hospitalized at Wesley Long Hospital. Gloria Head, a fellow Kroger employee, recalled visiting Reid and observing a container of red Jello in defendant's purse. Dr. Garrett had previously testified that Reid had informed him on 30 May 1986 that he began vomiting after eating Jello the previous night.

Wanda B. Moss, a registered nurse in the ICU at North Carolina Baptist Hospital, described the treatment Reid underwent in the hospital. On some occasions Reid was fed with a Dobhoff feeding tube inserted into him. The tube is very narrow and becomes easily clogged. Nurse Moss stated that Coca-Cola is inserted by syringe into the tube and is effective in unclogging it. Defendant was frequently in the room when Nurse Moss used the syringe and the

Coke to clear Reid's Dobhoff tube. The Coke was often left unattended in the patient's room, and the syringes were kept in an unlocked closet in Reid's room. Nurse Moss further recalled defendant bringing peanut butter milk shakes, banana pudding, tomato pudding, corn bread, and milk from home for Reid and feeding him herself. The ICU nursing notes reflect repeated instances where Reid complained later in the day of being nauseated after having been fed by defendant. Nurse Moss never saw anyone other than defendant bring food to Reid or feed him.

Pursuant to a court order, Reid's body was exhumed on 13 June 1989 in Alamance County. The body was taken to the medical examiner's office in Chapel Hill, North Carolina, and an autopsy was performed. The autopsy revealed "clearly recognizable" Mees lines across the fingernails of both hands and the toxicology report indicated a concentration of arsenic in Reid's liver tissue "30 times higher than one might see in an average individual who is not having a significant exposure to arsenic." The arsenic in Reid's brain tissue was approximately sixty-seven times higher than that expected in a normal individual. As a result of these findings, Dr. John D. Butts, Chief Medical Examiner for the State of North Carolina, concluded that "Reid died as a result of the complications of arsenic poisoning." Furthermore, based on an analysis of hair samples from the exhumed body of Reid, Dr. Vincent Guinn, a professor of chemistry at the University of California-Irvine and an expert in the field of nuclear chemistry, concluded that the arsenic levels found in Reid's hair correspond "to a long period of ingestion of arsenic, multiple ingestions." Dr. Guinn noted that on 24 June 1986, the arsenic level peaked at 70 parts per million, which is "roughly 70 times the normal level."

The State presented testimony from several witnesses to link defendant with the product Anti-Ant. Brenda Green, a Kroger co-worker, recalled hearing defendant recommend Anti-Ant to a customer as a good ant-killer. Moore testified that, during the summer of 1985, defendant showed him a bottle of Anti-Ant and asked him to purchase some for her from Byrd's Food Center in the Glen Raven section of Burlington. Moore further testified that he purchased the Anti-Ant at Byrd's, gave the bottle of Anti-Ant to defendant, and told defendant that he had purchased it at Byrd's. Leonard Wolfe, a former co-worker, who owned a small, community convenience store called Ken's Quickie Mart recalled defendant

STATE v. MOORE

[335 N.C. 567 (1994)]

coming into the store in early April 1989 and asking if he "had any Anti-Ant in stock."

Peggy Vaughn, owner and operator of Atla Chemical Company in McLeansville [North Carolina], testified that her company had manufactured Anti-Ant for over ten years, including the years 1985-1988. The main active ingredient in the product Anti-Ant is arsenic. She further stated that State's Exhibit #30 was identical in appearance to other bottles of Anti-Ant manufactured by her company. Other testimony showed the availability of Anti-Ant to customers in the Burlington area.

Special Agent Thomas J. Currin of the North Carolina State Bureau of Investigation testified concerning the investigation into a letter received by defendant in the Alamance County jail purportedly written by a man named Garvin Thomas. In the letter, Thomas allegedly confessed to the murder of Reid and the attempted murder of Moore. Based on his examinations and comparisons of defendant's handwriting samples and those of Garvin Thomas, Agent Currin, a questioned document examiner, concluded that, in his opinion, defendant was the person who wrote the confession letter attributed to Garvin Thomas.

The State presented extensive evidence concerning the deaths of defendant's father and her first husband and Moore's illness. Recitation of this evidence as necessary will be included in the Court's discussion of defendant's assignment of error related to the admission of this evidence.

Once the State rested, W.A. Shulenberger, testifying as an expert witness for the defendant, opined that defendant could not have written the confession letter. Shulenberger's examination revealed no evidence of an attempt to disguise or alter the handwriting. He stopped short, however, of stating that Garvin Thomas actually wrote the confession letter.

Carolyn Hinshaw, a jailer with the Alamance County Sheriff's Department, testified that a man, carrying a teddy bear and signing his name as "Garvin Thomas," attempted to visit defendant in jail saying "he had done so much wrong in his life and hurt so many people that he wanted to start doing some good to right the wrongs." Deputy Hinshaw testified this incident occurred two to four months before 19 May 1990—the date on the alleged confession letter. Carol DiLelo, a secretary for defense counsel, Mitchell

M. McEntire, testified that, when her employer learned of the "teddy bear" incident, she was told to arrange a meeting with Garvin Thomas. At that meeting, Mr. Thomas stated that "he knew he was going to die and that he knew Blanche Moore had not done the things she was accused of doing and he knew that he had hurt her and he had hurt her family and he was sorry about all that."

Defendant also called as a witness her lawyer in her sexual harassment suit who testified that at defendant's request, he referred her to Mr. Robert Hinshaw, an attorney in Winston-Salem, about preparing a will for Reid. Hinshaw then testified that defendant gave him some notes which defendant said had been prepared by a nurse and asked if he could draft a proposed will. Hinshaw drafted a proposed will and power of attorney and then visited Reid in the hospital. At the time Reid could not speak, but Reid could communicate by nodding his head and squeezing a person's hand. The nurses present assisted Hinshaw in interpreting Reid's communications and Hinshaw was satisfied that Reid understood what was being read and what he was doing. The next day Hinshaw returned to the hospital and in the presence of a notary public and two nurses again went over the will with Reid. Since Reid could not sign his name, Hinshaw signed for him in the presence of Reid, the notary, and the two nurses who witnessed the will. Hinshaw testified that he inquired whether Reid understood that by leaving his property to defendant, his sons would be left out and whether Reid wanted defendant to share in the insurance proceeds. Reid responded affirmatively to both these questions. The same procedure was followed in executing the power of attorney.

Defendant took the stand on her own behalf and testified that while Reid was in the ICU at Baptist Hospital, she recalled him being fed only with a tube. She denied seeing Reid "have any food at all during that time" or having ever taken food to Reid while he was in the hospital. She specifically denied taking banana pudding or peanut butter milk shakes to Reid in the hospital. Defendant did not recall conversing with anyone about Reid's autopsy and told the jury she would not have been opposed to an autopsy to determine the cause of his death.

As to Reid's will, defendant denied having anything whatsoever to do with his will, even though Reid gave her his power of attorney. While acknowledging she had heard of Anti-Ant, defendant

denied ever having purchased, attempted to purchase, or directed anyone else to purchase the product. Defendant denied administering arsenic to James N. Taylor, Reid, or Moore.

Additional facts, when necessary, will be set forth with respect to the various issues.

The jury found defendant guilty of the first-degree murder of Reid. During the capital sentencing phase, the jury found as aggravating circumstances that (i) the murder was committed for pecuniary gain and (ii) the murder was especially heinous, atrocious, or cruel. As mitigating circumstances, the jury found that defendant (i) "provided well for the needs of her children while they were growing up"; (ii) "upon being informed of the warrant for her arrest, peacefully submitted herself in accordance with her duty"; and (iii) "demonstrated concern and kindness for others in her community." Based upon findings that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstances, the jury recommended that defendant be sentenced to death.

PRETRIAL ISSUES

[1] In her first assignment of error, defendant argues the trial court erred in denying her motions for change of venue. Defendant contends she could not obtain a fair and impartial trial in Forsyth County on account of the extensive pretrial publicity resulting in great prejudice against her in violation of her state and federal constitutional rights. For the reasons discussed herein, we find this assignment of error to be without merit.

To support her initial motion, defendant introduced evidence to show that the local media provided regular coverage of her case, including detailed newspaper articles regarding the deaths of Kiser and Taylor and the illness of Moore; that WKRR-FM, an Asheboro, North Carolina, radio station with a market in Forsyth County, repeatedly played a song which implied defendant was guilty and called her a "black widow spider"; and that the results of a random survey compiled by defendant's investigator showed the community held preconceptions prejudicial to her case. Random survey results showed that forty-nine of the fifty respondents had heard of and/or followed defendant's case with interest. Of those

STATE v. MOORE

[335 N.C. 567 (1994)]

forty-nine, thirty-six indicated they had reached an opinion as to defendant's guilt or innocence. Thirty-one of those individuals believed defendant to be guilty while five believed her to be innocent. At least two people polled said "that they felt she was guilty and that they should fry the woman." However, in her brief, defendant concedes that the media coverage was largely factually based.

In denying defendant's motion for change of venue, the trial court made the following findings of fact: (i) Forsyth County is a large, urban county with approximately 260,000 in population; (ii) defendant was not a resident of Forsyth County and, in fact, lived in Alamance County; (iii) the majority of individuals involved in the case also resided in Alamance County; and (iv) there had been extensive publicity in Forsyth County and the surrounding areas but the publicity was not inflammatory and, in fact, some was exculpatory. The trial court concluded as a matter of law "that defendant has failed to establish a reasonable likelihood that she would not get a fair trial in Forsyth County and the Court in its discretion" denied defendant's motion for change of venue.

Defendant later renewed her motion but presented no additional supporting evidence at the motion hearing. The trial court deferred ruling on this motion pending the filing of any additional affidavits, articles, or recordings for consideration. Prior to trial, the court denied the renewed motion for change of venue as well.

The statute pertaining to change of venue motions provides:

If, upon motion of the defendant, the court determines that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial, the court must either:

(1) Transfer the proceeding to another county in the prosecutorial district as defined in G.S. 7A-60 or to another county in an adjoining prosecutorial district as defined in G.S. 7A-60, or

(2) Order a special venire under the terms of G.S. 15A-958.

The procedure for change of venue is in accordance with the provisions of Article 3 of this Chapter, Venue.

N.C.G.S. § 15A-957 (1988). In the recent case of *State v. Yelverton*, 334 N.C. 532, 434 S.E.2d 183 (1993), this Court stated:

STATE v. MOORE

[335 N.C. 567 (1994)]

The test for determining whether venue should be changed is whether "it is reasonably likely that prospective jurors would base their decision in the case upon pre-trial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impressions they might have formed." [*State v. Jerrett*, 309 N.C. 239, 255, 307 S.E.2d 339, 347 (1983).] The burden of proving the existence of a reasonable likelihood that he cannot receive a fair trial because of prejudice against him in the county in which he is to be tried rests upon the defendant. *State v. Madric*, 328 N.C. 223, 226, 400 S.E.2d 31, 33 (1991). "In deciding whether a defendant has met his burden of showing prejudice, it is relevant to consider that the chosen jurors stated that they could ignore their prior knowledge or earlier formed opinions and decide the case solely on the evidence presented at trial." *Jerrett*, 309 N.C. at 255, 307 S.E.2d at 348. The determination of whether a defendant has carried his burden of showing that pre-trial publicity precluded him from receiving a fair trial rests within the trial court's sound discretion. *Madric*, 328 N.C. at 226, 400 S.E.2d at 33. The trial court has discretion, however, only in exercising its sound judgment as to the weight and credibility of the information before it, including evidence of such publicity and jurors' averments that they were ignorant of it or could be objective in spite of it. When the trial court concludes, based upon its sound assessment of the information before it, that the defendant has made a sufficient showing of prejudice, it must grant defendant's motion as a matter of law. *See State v. Abbott*, 320 N.C. 475, 478, 358 S.E.2d 365, 368 (1987).

*Id.* at 539-40, 434 S.E.2d at 187.

From our review of the materials submitted by both defendant and the State, we are satisfied the trial court did not err in concluding that defendant failed to meet her burden of proving that pretrial publicity tainted her chances of receiving a fair and impartial trial. Of the thirty-three articles submitted, at least three contain potentially exculpatory information. Only one of the thirty-three is potentially inflammatory—an article entitled, "The Men In Her Life Keep Dropping Like Flies," published in *True Police Cases*, and as to this one defendant made no showing concerning the extent of its circulation. The remaining twenty-nine articles which defendant contends caused undue pretrial publicity are primari-

ly factually based. The articles submitted begin in September of 1989 and continue through August of 1990 and address the sequence of events including the initial investigation, the indictments, all pretrial motions, the psychiatric testing of defendant, the behavior of defendant while in prison awaiting trial, and the later investigation focusing on the alleged confession letter and handwriting analyses related thereto. "This Court has consistently held that factual news accounts regarding the commission of a crime and the pretrial proceedings do not of themselves warrant a change of venue." *State v. Gardner*, 311 N.C. 489, 498, 319 S.E.2d 591, 598 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985).

This Court has also noted that the potential jurors' responses to questions on *voir dire* conducted to select the jury are the best evidence of whether pretrial publicity was prejudicial or inflammatory. *State v. Richardson*, 308 N.C. 470, 480, 302 S.E.2d 799, 805 (1983). "Where, as here, a jury has been selected to try the defendant and the defendant has been tried, the defendant must prove the existence of an opinion in the mind of *a juror who heard his case* that will raise a presumption of partiality." *State v. Madric*, 328 N.C. 223, 228, 400 S.E.2d 31, 35 (1991). If each juror states unequivocally that he can set aside what he has heard previously about a defendant's guilt and arrive at a determination based solely on the evidence presented at trial, the trial court does not err in refusing to grant a change of venue. *State v. Soyars*, 332 N.C. 47, 54, 418 S.E.2d 480, 484-85 (1992).

In the present case, to assure a fair and impartial venire, the trial court conducted an initial screening to eliminate potential jurors who had already formed biases about defendant. Of the 110 potential jurors initially screened on an individual basis by the court concerning pretrial publicity, forty-six were excused for cause on account of preconceived opinions of defendant's guilt or innocence determined from media coverage. The remaining sixty-four potential jurors stated that, notwithstanding the publicity, they could be fair and impartial and decide the case solely on the evidence presented in court. These sixty-four prospective jurors, having passed the initial screening process, were subsequently questioned by the State and defendant in a standard *voir dire*. Each of the twelve jurors who ultimately served on the jury during defendant's trial stated unequivocally during the initial screening process and again during *voir dire* that they had formed no opinions about the case, that they could be fair and impartial, and that

they would base their decisions solely on the evidence presented at trial.

Considering the entire record before us, we conclude that defendant has not established a reasonable likelihood that pretrial publicity prevented her from receiving a fair and impartial trial in Forsyth County. We hold, therefore, that the trial court did not err in denying defendant's motions for a change of venue.

[2] In her next assignment of error, defendant contends the trial court erred in denying her motions for a bill of particulars with regard to the circumstances surrounding the death of Reid. The record discloses that on 9 October 1989, defendant filed a motion for a bill of particulars requesting the State provide various information, including the alleged motive for Reid's murder, the date or dates of Reid's poisoning and the means thereof, the State's version of the facts concerning any poisonings and any and all other information within the possession of the District Attorney, his agents and investigators. Subsequently, on 31 October 1989, defendant filed a supplemental motion for a bill of particulars seeking information as to (i) the exact cause of death, (ii) the exact date or dates as well as the time on said dates when Reid was poisoned, (iii) the exact geographic locations where the poison was introduced into Reid's body, (iv) the type poison introduced into Reid's body, (v) the identity of any persons present during the poisonings, (vi) the identity of any persons who supplied the poison used, (vii) the specifics as to dates, times, locations of each instance where defendant acquired any poison, including substances containing arsenic, (viii) the identity of any persons present when defendant acquired the poison, and (ix) a list of aggravating circumstances on which the State would rely in seeking the death penalty.

At the hearing on defendant's motions the State noted that it had turned over to defendant all Reid's medical records including the autopsy report and was in no better position to state the cause of death other than "complications from arsenic poisoning." The State further responded that "[t]he victim, Raymond Carlton Reid, received numerous doses of arsenic poisoning during the period of time from December 31, 1985 through October 7, 1986." The State further asserted that the specific time of the poisoning was not essential since the case involved "chronic poisoning" and not "one particular act against Raymond Reid on a particular day at a certain time." The trial court denied the motion except as to

items four and nine, namely, the type poison and the aggravating circumstances to be submitted.

The purpose of a bill of particulars pursuant to N.C.G.S. § 15A-925 "is to inform defendant of specific occurrences intended to be investigated at trial and to limit the course of the evidence to a particular scope of inquiry." *State v. Young*, 312 N.C. 669, 676, 325 S.E.2d 181, 186 (1985).

> Whether to allow or deny a motion for a bill of particulars
>
> is generally within the discretion of the trial court and is not subject to review "except for palpable and gross abuse thereof." *State v. McLaughlin*, 286 N.C. 597, 603, 213 S.E.2d 238, 242 (1975), *death sentence vacated*, 428 U.S. 903 (1976). The court *must* order the State to respond to a request for a bill of particulars only when the defendant shows that the information requested is *necessary* to enable him to prepare an adequate defense. G.S. 15A-925(c). Stated otherwise, a denial of a defendant's motion for a bill of particulars will be held error only when it clearly appears to the appellate court that the lack of timely access to the requested information significantly impaired defendant's preparation and conduct of his case.

*State v. Easterling*, 300 N.C. 594, 601, 268 S.E.2d 800, 805 (1980).

During discovery, the State provided defense counsel with copies of Reid's entire medical record along with the autopsy report and reports detailing the results of the hair analyses. This information enabled defendant to determine the time frame when Reid's body contained elevated levels of arsenic and to analyze the victim's medical condition at these times. At trial, the State did not attempt to adduce any evidence indicating the timing of the poisonings with any greater particularity than reflected in the documentation furnished to defendant covering the period from "December 31, 1985 through October 7, 1986." The State confirmed that arsenic was the poison used, and defendant had obtained through discovery statements allegedly made by defendant linking her to the purchase of Anti-Ant, an arsenic-based ant killer.

Defendant does not suggest surprise or specify in what manner the denial of her motions for a bill of particulars affected her trial strategy. The State introduced nothing at trial which could have come as a surprise to the defendant pertaining to the dates of the poisonings. She had full knowledge of the specific occurrences

to be investigated at trial, *State v. Detter*, 298 N.C. 604, 612, 260 S.E.2d 567, 575 (1979). On the record before this Court, defendant has failed to show that lack of access to information "significantly impaired [her] preparation and conduct of the case." *Easterling*, 300 N.C. at 601, 268 S.E.2d at 805. We hold, therefore, that the trial court did not err in denying defendant's motions for a bill of particulars.

[3] Defendant next contends the trial court erred in failing to compel the Forsyth County District Attorney to comply with a prior agreement between defense counsel and the Alamance County District Attorney establishing an open file policy. While the trial for the murder of Reid was pending in Forsyth County, charges were also pending against defendant in Alamance County for the murder of James N. Taylor and for the assault with a deadly weapon with intent to kill inflicting serious injury on Moore. For judicial economy and to avoid possible prejudice created by extensive pretrial publicity in Alamance County, Judge J.B. Allen, Jr. entered an order transferring venue in the Alamance County cases to Forsyth County.

Prior to the order, the Alamance County District Attorney's office agreed to an open file policy to afford "the defense the benefit of every document and every matter and thing in the file." However, when defendant's motion for a change of venue was granted, the District Attorney in Forsyth County refused to comply with the previous arrangement. Defendant argues in her brief that access to the Alamance County District Attorney's files was

> of material importance to the Defendant, particularly in light of the expressed intention on the part of the Forsyth County District Attorney to rely . . . upon evidence pertaining to the facts and circumstances surrounding the deaths of the Defendant's father and first husband, as well as the illnesses suffered by Rev. Moore.

The statute governing disclosure of evidence by the State provides:

> (a) Except as provided in G.S. 15A-903(a), (b), (c) and (e), this Article does not require the production of reports, memoranda, or other internal documents made by the prosecutor, law-enforcement officers, or other persons acting on behalf of the State in connection with the investigation or prosecution of

the case, or of statements made by witnesses or prospective witnesses of the State to anyone acting on behalf of the State.

(b) Nothing in this section prohibits a prosecutor from making voluntary disclosures in the interest of justice.

N.C.G.S. § 15A-904 (1988). Defendant has made no allegations that the State failed to provide appropriate discovery pursuant to N.C.G.S. § 15A-903. Defendant also has failed to provide any authority for her conclusion that the prosecutor of one district should be bound by the open file discovery policy of a prosecutor in another district.

The general rule is that "the work product or investigative files of the district attorney, law enforcement agencies, and others assisting in preparation of the case are not open to discovery." *State v. Brewer,* 325 N.C. 550, 574, 386 S.E.2d 569, 582 (1989), *cert. denied,* 495 U.S. 951, 109 L. Ed. 2d 541 (1990). While the prosecutor may, in his or her discretion, proceed under an open file policy, he or she may not be forced to do so. Similarly, the District Attorney in one district may not be compelled to comply with an agreement pertaining to discovery entered into by the District Attorney in another district once venue has been changed in the case. Furthermore, defendant has not shown any prejudice resulting from the Forsyth District Attorney's refusal to follow an open file policy. We conclude, therefore, that the trial court did not err in denying defendant's motion to compel the State to abide by the prior agreement between defendant and the Alamance County District Attorney. This assignment of error is without merit.

[4] Defendant next contends the trial court erred in denying her motion for individual sequestered *voir dire* of prospective jurors. In denying the motion for individual *voir dire* throughout the entire selection process, the trial court ruled it would

allow the motion to conduct an individual voir dire on the preliminary matters of pretrial publicity and whether or not a juror has formed an opinion about the case. . . . [W]e'll screen a pool of jurors for publicity; and then once we get an acceptable number, we'll bring them in twelve at a time and go through the regular voir dire process.

Following the initial screening process, twelve prospective jurors were seated in the jury box while the remaining members of the venire were sequestered outside the courtroom until they were called to replace an excused venireperson.

STATE v. MOORE

[335 N.C. 567 (1994)]

A motion for individual *voir dire* is addressed to the sound discretion of the trial court whose ruling will not be disturbed except for an abuse of discretion. *State v. Oliver*, 302 N.C. 28, 274 S.E.2d 183 (1981), *appeal after remand*, 309 N.C. 326, 307 S.E.2d 304 (1983); *State v. Barfield*, 298 N.C. 306, 259 S.E.2d 510 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L. Ed. 2d 1181 (1980). Defendant argues that collective *voir dire* on the issues other than pretrial publicity inhibited the candor of the jurors and permitted the prospective jurors to become educated concerning responses which would enable them to be excused from the panel. Thus, a "domino effect" is produced as each juror expresses his or her aversion to the death penalty in order to be relieved of jury duty.

As we have previously held in *Oliver* and *Barfield*, this argument is speculative and without merit. The record does not support defendant's contentions. The assignment of error is overruled.

[5] Defendant next argues that the trial court erred in denying her pretrial motion that prospective jurors be examined on their opinions concerning defendant's eligibility for parole upon conviction. This issue has previously been decided against defendant. *State v. Syriani*, 333 N.C. 350, 428 S.E.2d 118 (1993), *cert. denied*, --- U.S. ---, 126 L. Ed. 2d 341 (1993), *reh'g denied*, --- U.S. ---, 126 L. Ed. 2d 707 (1994); *State v. Roper*, 328 N.C. 337, 402 S.E.2d 600, *cert. denied*, --- U.S. ---, 116 L. Ed. 2d 232 (1991); *State v. McNeil*, 324 N.C. 33, 375 S.E.2d 909 (1989), *sentence vacated on other grounds in light of McKoy*, 494 U.S. 1050, 108 L. Ed. 2d 756 (1990); *State v. Robbins*, 319 N.C. 465, 356 S.E.2d 279, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987).

[6] In her next assignment of error, defendant argues the trial court erred in conducting the *voir dire* during the initial screening process, thus denying counsel the opportunity to make a full and complete inquiry into the fitness of the prospective jurors for service. The trial court initially allowed the State and the defendant to screen the first thirteen prospective jurors concerning pretrial publicity but then took over and conducted the remainder of the screening process after several admonitions to counsel to speed up the questioning.

In an effort to expedite this initial screening process, the trial court directed the following questions to each prospective juror:

THE COURT: Could you as best you can put out of your mind what you might have read or heard and base your decision solely on the evidence that you hear in the courtroom?

. . . .

THE COURT: Could you be fair and impartial to this defendant and not let anything you might have read or heard affect your decision in this case?

. . . .

THE COURT: The law requires that a juror presume a defendant to be innocent until proven guilty beyond a reasonable doubt. Could you do that regardless of what you've already read or heard?

. . . .

THE COURT: And as a result of what you've read or heard, you haven't already made up your mind or formed or expressed an opinion about the guilt or innocence of this defendant, have you?

Based on the responses to these questions, the prospective juror was either excused for cause upon motion by defendant or asked to return the following day for the continuation of the standard *voir dire*. A review of the entire *voir dire* reveals that, even after the trial court took over the screening process, defense counsel was permitted on several occasions to follow up on the questions previously asked by the court. During the standard *voir dire*, defense counsel was allowed to question prospective jurors further concerning any preconceived opinions attributable to the pretrial publicity surrounding this case. Two prospective jurors who had passed the initial screening process were excused for cause when additional questioning disclosed they each had formed an opinion concerning defendant's guilt.

N.C.G.S. § 15A-1214 provides, in pertinent part:

(c) The prosecutor and the defense counsel, or the defendant if not represented by counsel, may personally question prospective jurors individually concerning their fitness and competency to serve as jurors in the case to determine whether there is a basis for a challenge for cause or whether to exercise a peremptory challenge. The prosecution or defense is not

foreclosed from asking a question merely because the court has previously asked the same or similar question.

Defendant has failed to show a violation of N.C.G.S. § 15A-1214(c). The record discloses that the trial court acted merely to expedite the initial screening process by asking questions designed to eliminate prospective jurors with obvious opinions regarding defendant's guilt. Once the standard *voir dire* was commenced, defense counsel was given latitude to examine the prospective jurors for any latent ideas or beliefs formed as a result of the pretrial publicity pertaining to defendant's case. While both the State and the defendant indisputably have the right to question prospective jurors to determine their fitness and competency to serve, "the extent and manner of counsel's inquiry rests within the trial court's discretion." *State v. Soyars*, 332 N.C. at 56, 418 S.E.2d at 486. This assignment of error is without merit.

### GUILT-INNOCENCE PHASE

[7] Defendant next contends the trial court erred in denying defendant's motion *in limine* to restrict introduction by the State of evidence concerning Kiser and Taylor's deaths and Moore's illness. Defendant also contends admission of this evidence was error and that the prosecutor's closing argument based thereon should have been disallowed and the State's requested jury instruction on similar acts or crimes denied. On 14 September 1990, the District Attorney filed a motion for an order allowing the admission into evidence of other similar crimes and offenses, charged and uncharged, against the defendant which tend to prove one or more of the purposes set forth in Rule 404(b) of the North Carolina Rules of Evidence. Following an extensive pretrial hearing on 5 October 1990, the trial court ruled that the State would be allowed to present evidence of similar crimes. The court noted it would rule at a later time on what preliminary showing the State would be required to make for the evidence to be admitted.

Prior to the impanelment of the jury, the trial court heard arguments on defendant's related motion *in limine* to restrict the State from commenting during its opening statement upon the evidence of similar crimes committed by defendant against Kiser, Taylor, and Moore. The trial court allowed defendant's motion as to arguments concerning the arsenic poisoning of Kiser but denied the motion, and over defendant's continuing objection, allowed opening statements and evidence concerning the arsenic poisoning death

of Taylor and the near death of Moore. The court did not allow evidence of the levels of arsenic found in Kiser's body.

N.C.G.S. § 8C-1, Rule 404(b) provides:

> (b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

Relying on *State v. Johnson*, 317 N.C. 417, 347 S.E.2d 7 (1986), and *State v. Breeden*, 306 N.C. 533, 293 S.E.2d 788 (1982), defendant contends that evidence of the prior death of Taylor and the arsenic-related illness of Moore was not admissible under Rule 404(b) because the State did not present direct evidence linking defendant as a participant in the prior crimes. This Court, however, rejected the requirement of a "direct evidence link" for purposes of Rule 404(b) in *State v. Jeter*, 326 N.C. 457, 389 S.E.2d 805 (1990). Distinguishing *Breeden* the Court noted:

> *Breeden*, however, preceded the codification of N.C.R. Evid. 404(b). That rule includes no requisite that the evidence tending to prove defendant's identity as the perpetrator of another crime be direct evidence, exclusively. Neither the rule nor its application indicates that examples of other provisions— such as admissibility of evidence of other offenses to prove motive, opportunity, intent, preparation, or plan—rest solely upon direct evidence. *E.g., State v. Price*, 326 N.C. 56, 388 S.E.2d 84 (1990) (circumstantial evidence of defendant's perpetration of "virtually identical" strangulation, proximate in time, showing preparation, plan, knowledge or identity). Under the statutory scheme of Rules 403 and 404, the concern that anything other than direct evidence of a defendant's identity in a similar offense might "mislead [the jury] and raise a legally spurious presumption of guilt" is met instead by the balancing test required by Rule 403: the critical inquiry regarding evidence of other offenses introduced for purposes of showing defendant's identity as the perpetrator of the offense for which he is being tried is not whether it is direct or circumstantial, but whether its tendency to prove identity in the charged

offense substantially outweighs any tendency unfairly to prejudice the defendant.

*Id.* at 459, 389 S.E.2d at 807.

Rule 404(b) is a rule of inclusion of relevant evidence with but one exception, that is, the evidence must be excluded if its only probative value is to show that defendant has the propensity or disposition to commit an offense of the nature of the crime charged. *State v. Stager*, 329 N.C. 278, 302, 406 S.E.2d 876, 890 (1991). In *Stager*, this Court held that the proper test under Rule 404(b) is whether there was "substantial evidence tending to support a reasonable finding *by the jury* that the defendant committed a similar act or crime and its probative value is not limited *solely* to tending to establish the defendant's propensity to commit a crime such as the crime charged." 329 N.C. at 303-304, 406 S.E.2d at 890 (adopting the rationale of *Huddleston v. United States*, 485 U.S. 681, 99 L. Ed. 2d 771 (1988) (construing Fed. R. Evid. 404(b) ) ). "[E]vidence of other offenses is admissible so long as it is relevant to any fact or issue other than the character of the accused." *State v. Weaver*, 318 N.C. 400, 403, 348 S.E.2d 791, 793 (1986).

Murder by poisoning is inherently a surreptitious crime. Rarely are there eyewitnesses, thus, circumstantial evidence is often the only evidence to prove the State's case against an accused. In the present case, the State presented extensive circumstantial evidence marking the similarities between Reid's death and the arsenic poisoning death of Taylor and the arsenic poisoning of Moore. Three different men either married to or intimately involved with defendant died, or barely escaped death, from arsenic poisoning, an unusual cause of death. In each case defendant had motive (financial), opportunity (close relationship), and means (knowledge of and access to Anti-Ant). In each case medical evidence suggests that multiple doses of arsenic were administered to the victim over a long period of time, as opposed to one large fatal dose. In each case defendant was frequently alone with the victim in the hospital, and medical testimony suggests that certain of defendant's visits in which she fed the victim corresponded with an onset of symptoms characteristic of arsenic poisoning. In each case defendant was heard to say that she hated the victim or that the victim was cruel or evil. In the cases of Reid and Taylor, defendant was already seeing her next victim at the time of the arsenic assaults.

Under Rule 404(b) a prior crime is similar to the one charged if some unusual facts or particularly similar acts are present in both which would indicate that both crimes were committed by the same person. *Stager*, 329 N.C. at 304, 406 S.E.2d at 890-91. While these similarities need not be unique or bizarre, they must "tend to support a *reasonable* inference that the same person committed both the earlier and later acts." *Id.* at 304, 406 S.E.2d at 891. Given the similarities between the crime charged and the other crimes presented by the State, we conclude that the evidence of the other offenses was relevant under Rule 404(b) as evidence tending to prove *modus operandi*, motive, opportunity, intent and identity of defendant as the perpetrator. Accordingly, the trial court did not err in admitting the evidence and in denying defendant's motion. This assignment of error is, also, overruled.

[8] Defendant next contends the trial court erred in allowing the State to introduce testimony for the sole purpose of generating sympathy for Reid's family. The trial court overruled defendant's objections to the testimony of Wanda B. Moss, a registered nurse in the ICU at North Carolina Baptist Hospital, who had cared for Reid during his final illness. Defendant argues that Nurse Moss' testimony concerning medical techniques and medical equipment used to treat Reid served merely to inflame the passions of the jury and elicit feelings of sympathy for the Reid family. Defendant also argues the testimony of Reid's son concerning his father's appearance and mental state reinforced the inflammatory affect of Nurse Moss' testimony. These contentions are meritless.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). "All relevant evidence is admissible" unless it is excluded by some other constitutional or statutory exclusionary rule. N.C.G.S. § 8C-1, Rule 402 (1992). Relevant evidence may, however, be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403 (1992).

The testimony of Nurse Moss was probative to show (i) that defendant had access to Reid in the hospital, (ii) that a correlation existed between defendant's feeding Reid and the onset of Reid's

symptoms, (iii) that Reid manifested symptoms associated with multiple system failure incident to arsenic poisoning, namely, swelling, rashes, skin splitting and acute paralysis, (iv) that Reid could swallow food notwithstanding the tubes, (v) that arsenic could have been introduced into Reid's body via the feeding tubes and (vi) finally, that Reid suffered inordinate pain over an extended period of time. The probative value of Nurse Moss' testimony outweighed any unfair 'prejudice to defendant. "[R]elevant evidence will not be excluded simply because it may tend to prejudice the opponent or excite sympathy for the cause of the party who offers it as evidence." *State v. Eason*, 328 N.C. 409, 421, 402 S.E.2d 809, 814 (1991). Furthermore, the record discloses that similar evidence from other witnesses was admitted without objection. "[W]here evidence is admitted over objection, but the same evidence has theretofore or thereafter been admitted without objection, the benefit of the objection is ordinarily lost." *State v. Murray*, 310 N.C. 541, 551, 313 S.E.2d 523, 530 (1984). This assignment of error is without merit.

[9] Defendant next argues that the trial court erred in denying her motion for mistrial following an emotional display by Assistant District Attorney Janet Branch during questioning of Moore as a State's witness. Defendant asserts that Branch, after the first several questions, "burst into tears and after some 30 seconds fled the courtroom" and that such an emotional outburst by one of the prosecuting attorneys made it virtually impossible for defendant to receive a fair and impartial trial.

N.C.G.S. § 15A-1061 provides, in relevant part:

> Upon motion of a defendant or with his concurrence the judge may declare a mistrial at any time during the trial. The judge must declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case.

The resolution of this issue lies within the sound discretion of the trial court. *State v. Blackstock*, 314 N.C. 232, 333 S.E.2d 245 (1985); *State v. Calloway*, 305 N.C. 747, 291 S.E.2d 622 (1982); *State v. Swift*, 290 N.C. 383, 226 S.E.2d 652 (1976).

> When such an incident involving an unexpected emotional outburst occurs, the judge must act promptly and decisively

to restore order and to erase any bias or prejudice which may have been aroused. Whether it is possible to accomplish this in a particular case is a question necessarily first addressed to the sound discretion of the trial judge. "Not every disruptive event occurring during the course of trial requires the court automatically to declare a mistrial," and if in the sound discretion of the trial judge it is possible despite the untoward event, to preserve defendant's basic right to receive a fair trial before an unbiased jury, then the motion for mistrial should be denied. On appeal, the decision of the trial judge in this regard is entitled to the greatest respect. He is present while the events unfold and is in a position to know far better than the printed record can ever reflect just how far the jury may have been influenced by the events occurring during the trial and whether it has been possible to erase the prejudicial effect of some emotional outburst. Therefore, unless his ruling is clearly erroneous so as to amount to a manifest abuse of discretion, it will not be disturbed on appeal.

*Blackstock*, 314 N.C. at 244, 333 S.E.2d at 253 (quoting *State v. McGuire*, 297 N.C. 69, 75, 254 S.E.2d 165, 169-70, *cert. denied*, 444 U.S. 943, 62 L. Ed. 2d 310 (1979) (quoting *State v. Sorrells*, 33 N.C. App. 374, 376-77, 235 S.E.2d 70, 72, *cert. denied*, 293 N.C. 257, 237 S.E.2d 539 (1977))).

Although the transcript is silent as to what actually transpired, it appears from arguments of counsel that once Ms. Branch became unable to continue questioning the witness and before her tears became apparent to the court, she immediately excused herself from the courtroom. The trial court, upon request by the State, promptly called for a short recess and removed the jury from the courtroom. No further proceedings took place until the next morning when defense counsel moved for mistrial. Following arguments from both parties, the trial court denied defendant's motion for mistrial pursuant to N.C.G.S. § 15A-1061. In so ruling, the trial judge noted that

while Ms. Branch was questioning the juror — excuse me — the witness that she did apparently become somewhat emotional and unable to ask further questions. There was no audible outburst. It was not clearly apparent to me whether she was crying or sick or what the problem was, but she did become unable to continue her questioning and did get up and leave

the courtroom. A recess was immediately called and the jury sent out.

When the jurors returned to the courtroom, the trial judge inquired whether Ms. Branch's inability to continue her questions for a brief period of time would in any way affect their decision in the case or their ability to be fair and impartial. No juror responded to these questions. Then by a show of hands, the jurors each affirmatively acknowledged that they could still base their "decision solely on the evidence that [they heard] from the witness stand and that nothing that happened or transpired would in any way prevent [them] from giving this defendant a completely fair and impartial verdict based solely on the evidence."

From our review of the transcript, the findings by the trial court and the responses of the jury members, we are satisfied the Assistant District Attorney's brief emotional display was not prejudicial to defendant. Ms. Branch removed herself from the courtroom quickly and quietly. The jury was immediately removed from the courtroom. In response to questions by the court, not one juror answered that the incident would prevent him or her from being able to give defendant a completely fair and impartial verdict based solely on the evidence. We conclude, therefore, that the trial court did not err in denying defendant's motion for mistrial. This assignment of error is overruled.

[10] Defendant next contends the trial court erred in failing to conduct a *"voir dire"* examination of the District Attorney's files to determine whether the State had provided defendant with required discovery pursuant to N.C.G.S. § 15A-903. During cross-examination of defendant's witness, Jean Leath, a jailer with the Alamance County Sheriff's Department, the prosecutor questioned her recollection of an interview between a former inmate, Terri Michelle Edwards, and Detective Benny Bradley, an investigator with the Burlington police department who was assigned to the case. In an effort to refresh her recollection, the prosecutor handed Ms. Leath a written report of the interview compiled by Detective Bradley. Defendant objected, arguing she had not been supplied a copy of the "statement" pursuant to N.C.G.S. § 15A-903(f)(5)(b) and *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215 (1963). Defendant argued the report was *Brady* material because it tended to show that the State's witness, Terri Michelle Edwards, had committed perjury during her testimony the previous week. The court,

believing the document to be a "statement," ruled that the prosecutor should provide defendant with a copy of the report. Court was recessed until the following day.

When court convened the next morning, the prosecutor, relying on *State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988), declined to produce the report because it was not a "statement" of Terri Michelle Edwards. The term "statement" found in N.C.G.S. § 15A-903 includes "statements signed or otherwise adopted by the witness and 'substantially verbatim' recitals or oral statements which are contemporaneously recorded." *Vandiver*, 321 N.C. at 573, 364 S.E.2d at 375. The State argued that this document contains merely "a narrative [written by Detective Bradley at a later time] of what the witness had said. . . . It is not a transcription. It is not — has never been adopted, has never been subscribed to." Defendant then moved for the court to examine the document *in camera* to make the "determination of whether [the document] is a transcription or a field report" pursuant to *Vandiver*. The trial court sustained defendant's objection to the State's line of questioning about Detective Bradley's notes. At this point, the prosecutor agreed to produce the document but the trial court stated: "Well, I think it's probably too late now. We're ready for the jury and we're ready to get on with this trial." Defendant then renewed her earlier motion to strike Terri Edwards' testimony and instruct the jury to disregard it. The court denied the motion to strike.

Contrary to defendant's assertion on appeal, defendant did not request the court to conduct an *in camera* examination of the prosecutor's file to determine if the District Attorney had provided discovery as required. Rather defendant asked for an *in camera* inspection of Detective Bradley's report to determine if it was a statement or field report. The discovery statutes do not alter the general rule that the work product or investigative files of the District Attorney, law enforcement agencies, and others assisting in the preparation of the case are not subject to discovery. *State v. Brewer*, 325 N.C. 550, 574, 386 S.E.2d 569, 582 (1989), *cert. denied*, 495 U.S. 951, 109 L. Ed. 2d 541 (1990). The trial court is under no obligation to *ex mero motu* examine the prosecutor's investigative files for discovery compliance. This assignment of error is without merit.

[11] In her next assignment of error, defendant argues that the trial court erred in allowing the State to introduce items of physical

STATE v. MOORE

[335 N.C. 567 (1994)]

evidence which had no conceivable bearing upon the question of defendant's guilt and served merely to inflame the passions of the jury. The objectionable items were a bottle of Anti-Ant introduced during the testimony of Peggy Vaughn and several medical appliances introduced during Nurse Wanda Moss' testimony.

The State called Ms. Peggy Vaughn to testify that she owned and operated the Atla Chemical Company in McLeansville which had manufactured the product Anti-Ant for over ten years. The active ingredient in Anti-Ant is arsenic. When the State asked her to identify State's Exhibit 30 as a bottle of Anti-Ant produced by her company, defense counsel objected and argued the lack of relevance of the bottle of Anti-Ant to this case. The trial court overruled the objection.

Evidence is relevant if it has any logical tendency, however slight, to prove a fact in issue. *State v. Prevette*, 317 N.C. 148, 345 S.E.2d 159 (1986). The evidence may be excluded if the trial court determines that an unfair prejudicial effect of the evidence substantially outweighs its probative value. N.C.G.S. § 8C-1, Rule 403 (1992). The identification of the bottle of Anti-Ant was not irrelevant in this case. The State's evidence tended to prove that defendant was familiar with the product as early as the 1970s; that the product was available in the Burlington area at all relevant times; and that defendant actually had a bottle of Anti-Ant in her possession during the summer of 1985, which she showed to Moore with the request that he purchase another bottle. The fact that the bottle of Anti-Ant was not the exact bottle used by defendant to poison Reid is immaterial. *See State v. Hunt*, 297 N.C. 258, 261-62, 254 S.E.2d 591, 594-95 (1979) (holding that trial court properly admitted bottles of rat poison purchased by the Sheriff of Anson County from the same drugstore where nine months before defendant had purchased the same product to show availability of the poison at all times relevant to the murder investigation). The trial court did not err in admitting the bottle of Anti-Ant into evidence.

[12] During her testimony, Nurse Wanda Moss[1] identified the following medical devices:

---

1. In a previous assignment of error we have found Nurse Moss' testimony concerning Reid's physical appearance, his symptoms, the medical procedures used in his care and treatment, and the timing of defendant's visits with a renewed onset of symptoms to be relevant in establishing the causal link between Reid's illness and defendant's actions.

STATE v. MOORE

[335 N.C. 567 (1994)]

Exhibit 58—Nasogastric tube

Exhibit 59—Endotracheal tube

Exhibit 60—Dobhoff tube

Exhibit 63—Swan-Ganz catheter

Exhibit 64—IV fluid bag

Exhibit 65—Syringe

Exhibit 67—Suction catheter

The court allowed each of the exhibits to be introduced into evidence for illustrative purposes only. Defendant now argues that the admission of these medical devices, together with detailed explanations concerning their use and purpose, served merely to inflame the passions of the jury and had no reasonable bearing on proving any issue in controversy. Relying on *State v. Hennis*, 323 N.C. 279, 372 S.E.2d 523 (1988), defendant argues that the inflammatory nature of the devices prejudiced the jury and eclipsed any probative value the items may have had.

Defendant's reliance on *Hennis* is misplaced. In *Hennis* after defendant stipulated the cause of the victim's death, the forensic pathologist projected on the wall directly above defendant's head twenty-six slides of the bodies taken during the autopsies and nine taken at the scene of the crime. Thereafter, eight- by ten-inch color photographs of the crime scene and the autopsy were presented one by one to the members of the jury. In ruling that the "thirty-five duplicative photographs published to the jury . . . were excessive in both their redundancy and in the slow, silent manner of their presentation," *Hennis*, 323 N.C. at 286, 372 S.E.2d at 528, the Court found the photographic evidence more prejudicial than probative and granted the defendant a new trial. However, we have not extended the rationale of *Hennis* to include other forms of physical evidence.[2]

---

2. *See State v. Kyle*, 333 N.C. 687, 430 S.E.2d 412 (1993) (autopsy photographs); *State v. Syriani*, 333 N.C. 350, 428 S.E.2d 118 (1993) (photographs taken during medical treatment), *cert. denied*, --- U.S. ---, 126 L. Ed. 2d 341 (1993), *reh'g denied*, --- U.S. ---, 126 L. Ed. 2d 707 (1994); *State v. Locke*, 333 N.C. 118, 423 S.E.2d 467 (1992) (photographs of decomposed bodies); *State v. Cummings*, 332 N.C. 487, 422 S.E.2d 692 (1992) (photographs of the graves and autopsies); *State v. Phipps*, 331 N.C. 427, 418 S.E.2d 178 (1992) (color photographs of crime scene and body); *State v. Butler*, 331 N.C. 227, 415 S.E.2d 719 (1992) (autopsy photographs); *State v. Wynne*, 329 N.C. 507, 406 S.E.2d 812 (1991) (photographs of decomposed body); *State v. Stager*, 329 N.C. 278, 406 S.E.2d 876 (1991) (photographs of body); *State v. Bearthes*, 329 N.C. 149, 405 S.E.2d 170 (1991) (autopsy photographs); *State*

In the present case the medical devices were identified and introduced solely to illustrate the testimony of a registered nurse involved in Reid's primary care and treatment. The pieces of equipment were not excessively displayed and were not presented separately to the jury for a closer inspection. Defendant has failed to show how the single presentation of medical devices used in the daily attempts to save Reid's life rises to the level of excessive and repetitious use of the highly disturbing photographs found in *Hennis*. The medical equipment was introduced merely to illustrate the types of treatment received and the physical condition of Reid while at North Carolina Baptist Hospital. As discussed earlier, the probative value of this evidence substantially outweighs the possibility of any unfair prejudice to defendant. N.C.G.S. § 8C-1, Rule 403 (1992). This assignment of error is without merit.

[13] Defendant next contends the trial court erred in denying her motion to dismiss all the charges on the ground that the evidence was insufficient to warrant submission of the case to the jury. Defendant argues that since no poison was ever positively placed in her hands, it is mere speculation and conjecture that she was responsible for Reid's death; and a rational trier of fact could not justifiably find defendant guilty beyond a reasonable doubt. We disagree.

We have previously stated the standard for determining a motion to dismiss thusly:

When a defendant moves for dismissal, the trial court is to determine only whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense. *State v. Earnhardt*, 307 N.C. 62, 65-66, 296 S.E.2d 649, 651 (1982). Whether evidence presented constitutes substantial evidence is a question of law for the court. *Id.* at 66, 296 S.E.2d at 652. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v.*

---

v. *Thompson*, 328 N.C. 477, 402 S.E.2d 386 (1991) (photographs of victims' bodies), *habeas corpus denied*, 794 F. Supp. 173 (E.D.N.C. 1992), *aff'd*, 987 F. 2d 1038 (4th Cir. 1993); *State v. Robinson*, 327 N.C. 346, 395 S.E.2d 402 (1990) (photographs of crime scene); *State v. Cummings*, 326 N.C. 298, 389 S.E.2d 66 (1990) (autopsy photographs); *State v. Price*, 326 N.C. 56, 388 S.E.2d 84 (photographs of crime scene, body, and hands of victim), *sentence vacated on other grounds in light of McKoy*, 498 U.S. 802, 112 L. Ed. 2d 7 (1990); *State v. Hunt*, 325 N.C. 187, 381 S.E.2d 453 (1989) (photographs of defendant and his accomplice).

*Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). The term "substantial evidence" simply means "that the evidence must be existing and real, not just seeming or imaginary." *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980).

*State v. Vause*, 328 N.C. 231, 236, 400 S.E.2d 57, 61 (1991). In passing upon a defendant's motion to dismiss, the court must consider the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference. *Id.* at 237, 400 S.E.2d at 61. "The test of the sufficiency of the evidence to withstand the defendant's motion to dismiss is the same whether the evidence is direct, circumstantial, or both." *Id.* When the sufficiency of circumstantial evidence is questioned by a motion to dismiss, the issue for the trial court is "whether a reasonable inference of the defendant's guilt may be drawn from the circumstances." *Id.*

When a murder is committed by means of poison, premeditation and deliberation are not elements of the crime of first-degree murder and premeditation and deliberation are hence irrelevant. Similarly, a specific intent to kill is not relevant to the crime of first-degree murder perpetrated by means of poison. *State v. Johnson*, 317 N.C. 193, 203, 344 S.E.2d 775, 781 (1986).

> A murder which is perpetrated by means of poison is deemed to be murder in the first degree. G.S. 14-17. And when the State undertakes to prosecute for such a murder, it has the burden of producing sufficient evidence to prove beyond a reasonable doubt (1) that the deceased died by virtue of a criminal act, and (2) that such criminal act was committed by the accused. *S. v. Palmer*, 230 N.C. 205, 52 S.E.2d 908, and cases cited. In other words, the State, in such case, and in this case, has the burden of producing sufficient evidence to prove beyond a reasonable doubt that the deceased died from poison, administered with criminal intent by the person charged.

*State v. Hendrick*, 232 N.C. 447, 453, 61 S.E.2d 349, 354 (1950).

Applying these principles to the evidence before us, we find that there is sufficient, competent evidence to show, and from which a reasonable juror could find beyond a reasonable doubt, that Reid died from arsenic poisoning administered by defendant through a series of repeated doses. The evidence showed that defendant had on at least three occasions possessed, attempted to

purchase or asked someone else to purchase an arsenic-based ant killer. All three of the men who were either married to or romantically involved with defendant died or nearly died as a result of arsenic poisoning. Defendant expressed negative feelings about Reid to her psychiatrist and in November 1985 stated that her feelings toward him "had turned to hate." Defendant denied taking food to Reid in the hospital, but the State presented evidence that she did. Further the medical evidence demonstrated a correlation between defendant's visits and the renewed onset of Reid's symptoms. Given this evidence and the infrequency of death by arsenic poisoning, we are satisfied "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573 (1979), *quoted in State v. Earnhardt*, 307 N.C. 62, 66-67 n.1, 296 S.E.2d 649, 652 n.1 (1982). This assignment of error is overruled.

[14] Defendant next assigns error to the trial court's refusal to give particular jury instructions which she contends were supported by the evidence and in conformity with the law. We find no error in the court's failure to give the requested instructions on reasonable doubt, identity of the perpetrator, dying declarations, and uncontroverted evidence.

Reasonable doubt. Defendant requested the following instruction on reasonable doubt:

> When it is said that the jury must be satisfied of the Defendant's guilt beyond a reasonable doubt, it is meant that they must be fully satisfied, or entirely convinced, or satisfied to a moral certainty. If, after considering, comparing and weighing all the evidence, the minds of the jurors are left in such condition that they cannot say they have an abiding faith, to a moral certainty, in the Defendant's guilt, then they have a reasonable doubt.

The trial court declined to give the requested instruction, but advised it would use the reasonable doubt instruction in the Pattern Jury Instruction, which in substance covered everything defendant requested. The judge gave the following instruction from the Pattern Jury Instruction:

> Now, a reasonable doubt is a doubt based on reason and common sense arising out of some or all of the evidence that has been presented or the lack or insufficiency of the evidence,

as the case may be. Proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you of the defendant's guilt.

As defendant correctly notes, trial courts are not required to use the exact language of a requested instruction; but if the request is a correct statement of the law, and supported by the evidence, the court must give the instruction in substance. *State v. Monk*, 291 N.C. 37, 54, 229 S.E.2d 163, 174 (1976). The court is not required to define reasonable doubt absent a request, but if the court does so, the instruction must be a correct statement of the law. *State v. Wells*, 290 N.C. 485, 226 S.E.2d 325 (1976).

In light of this Court's recent decision in *State v. Bryant*, 334 N.C. 333, 432 S.E.2d 291 (1993), finding error under *Cage v. Louisiana*, 498 U.S. 39, 112 L. Ed. 2d 339 (1990), defendant's requested instruction arguably was not an accurate statement of the law. In *Bryant* we said, "When a jury is instructed that it may convict if it finds the defendant guilty to a moral certainty it increases the possibility that a jury may convict a person because the jury believes he is morally guilty without regard to the sufficiency of the evidence presented at trial to prove his guilt." 334 N.C. at 343, 432 S.E.2d at 297. The instruction in *Bryant* also contained the term, "honest substantial misgiving," which was not contained in defendant's requested instruction. However, recognizing that this Court recently declined to find error under *Cage* in *State v. Patterson*, 335 N.C. 437, 439 S.E.2d 578 (1994), where the trial court instructed in part that "[p]roof beyond a reasonable doubt means that you must be fully satisfied, entirely convinced or satisfied to a moral certainty of the Defendant's guilt," *id.* at 443-44, 439 S.E.2d at 582, we cannot say that the trial court erred in the present case.

The pattern instruction given by the trial court contained none of the offending *Cage* phrases, namely, "grave uncertainty," "actual substantial doubt," and "moral certainty," *Cage*, 498 U.S. at 40, 112 L. Ed. 2d at 341-42, or terms of similar import. Furthermore, this instruction correctly informed the jury that the standard for conviction beyond a reasonable doubt was certainty based upon the sufficiency of the evidence. Accordingly, the trial court did not err in refusing to give defendant's requested instruction on reasonable doubt.

**[15]** Identity of Perpetrator. Arguing that the State's evidence raised only a suspicion of defendant's guilt which was insufficient to convict, defendant requested the following instruction:

> Where all of the evidence in a case only engenders or raises the question, if Defendant did not commit the killing, then who did?, it is not sufficient evidence to sustain a conviction. Evidence which merely shows that Defendant had the opportunity to commit a criminal offense and which raises a suspicion that she did so is not sufficient evidence on which the jury may convict.

The court denied the motion, noting that it would give an instruction on circumstantial evidence which would be in substance what defendant requested. The trial court then instructed on direct and circumstantial evidence as follows:

> Now, there are two types of evidence from which you may find the truth as to the facts of a case, direct and circumstantial evidence. Direct evidence is the testimony of one who asserts actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is proof of a chain or group of facts and circumstances indicating the guilt or the innocence of a defendant. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. Nor is a greater degree of certainty required of circumstantial evidence than of direct evidence. You should weigh all the evidence in the case. After weighing all the evidence, if you are not convinced of the guilt of the defendant beyond a reasonable doubt, you must find her not guilty.

Defendant contends on appeal that her requested instruction taken in conjunction with her requested instruction on reasonable doubt would have focused the issue to be answered by the jury, namely, the identity of the individual responsible for Reid's death.

"[I]f a party requests an instruction which is a correct statement of the law and is supported by the evidence, the court must give the instruction at least in substance." *State v. Warren*, 327 N.C. 364, 371, 395 S.E.2d 116, 121 (1990). In this case the instruction as given, when read in conjunction with the entire charge to the jury, adequately links the State's burden to prove defendant's identity as the perpetrator of the crime with the quantum of proof

beyond a reasonable doubt. The trial court did not err in refusing to instruct the jury as requested by defendant.

[16] Dying Declarations. Defendant also requested the trial court to instruct the jury that "[t]he law recognizes that persons who believe themselves to be in danger of imminent death are highly unlikely to lie." During the charge conference, defense counsel argued this instruction was appropriate since there was conflicting evidence that Garvin Thomas had written a letter shortly before he died in which he confessed to the poisonings of Reid and Moore. The State responded there was no evidence showing that the letter was even written by Garvin Thomas. Defendant's own expert refused to opine that Thomas authored the letter while the State's expert, SBI Agent Currin, a questioned documents examiner and forensic chemist, ruled out Thomas as the author to a ninety-nine percent degree of certainty. Furthermore, the letter was offered into evidence by the State not as the dying declaration of Garvin Thomas but as evidence of defendant's "deceptive plan to throw suspicion away from herself."

Following this exchange, the trial court denied the request to instruct the jury on the inherent reliability of dying declarations but noted it would "certainly let both sides argue those positions." The court then instructed the jurors that they were the "sole judges of the weight to be given any evidence. By this I mean if you decide that certain evidence is believable, you must then determine the importance of that evidence in light of all the other believable evidence in the case." Therefore, we find that the jury was properly instructed on the issue of credibility of the evidence and it was not error for the trial court to refuse to instruct on dying declarations.

[17] Uncontroverted Evidence. Lastly, defendant contends the trial court erred in failing to give the following instruction pertaining to uncontradicted evidence:

You are not required to accept testimony, even when uncontradicted, and even if the witness is not impeached. You may decide, because of the witness' bearing and demeanor, or because of the inherent improbability of the testimony, or for other reasons sufficient to you, that such testimony is not worthy of belief.

Although the court denied defendant's request, our review of the jury charge reveals that the court gave the requested charge essentially verbatim. This assignment of error is without merit.

[18] In her next assignment of error, defendant contends the trial court erred in refusing to submit the lesser included offense of second-degree murder to the jury. Defendant argues that in not submitting second-degree murder, the court, in effect, allowed the jury to presume premeditation and deliberation. As a result, the trial court relieved the State of its burden of proof beyond a reasonable doubt. We disagree.

"[A]n intent to kill is not necessary to constitute the crime of first-degree murder when the murder was allegedly committed by means of poison. Any murder committed by means of poison is automatically first-degree murder." *State v. Johnson,* 317 N.C. 193, 204, 344 S.E.2d 775, 782 (1986). As noted earlier premeditation and deliberation are not elements of the crime and are, hence, irrelevant. *Id.* The evidence in this case supported each and every element of first-degree murder by poisoning. As in *Johnson,* the only evidence to the contrary was defendant's denial that she had committed the offense.

> If the State's evidence is sufficient to fully satisfy its burden of proving each element of the greater offense and there is no evidence to negate these elements other than the defendant's denial that he [or she] committed the offense, the defendant is not entitled to an instruction on a lesser offense.

317 N.C. at 205, 344 S.E.2d at 782. This assignment of error is overruled.

## SENTENCING PROCEEDING

[19] In her next assignment of error, defendant contends the trial court erred in denying her motion to strike the death penalty from consideration by the jury and to impose a life sentence. At the hearing on the motion, defense counsel argued that the death penalty in our state is unconstitutional for a number of reasons — none of which included the reasonable doubt instruction requested by defendant during the guilt-innocence phase. The trial court denied the motion.

Now, for the first time, defendant focuses her argument on the court's failure to give her requested instruction on reasonable

doubt during the guilt-innocence phase of the trial as the basis of her contention that the court should strike the death penalty from the jury's consideration. Without citing any authority, defendant asserts the trial court's failure to give her requested reasonable doubt instruction contributed substantially to the action of the jury in returning a death recommendation and exposed defendant to an arbitrary and capricious sentencing proceeding. Even had defendant properly preserved this issue for appellate review, this assignment of error is without merit. As we have discussed above, the trial court did not err in failing to give defendant's requested instruction on reasonable doubt.

[20] Defendant further contends under this same assignment of error that the trial court erred in failing to explain to the jury that the standard of beyond a reasonable doubt applies to mitigating circumstances as well as to aggravating circumstances. This contention is an incorrect statement of law. "The burden of proof on the existence of any mitigating circumstance is on the defendant, and the standard of proof is by a preponderance of the evidence." *State v. Holden*, 321 N.C. 125, 158, 362 S.E.2d 513, 534 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). For the foregoing reasons, we overrule this assignment of error.

[21] Defendant next contends the trial court erred in submitting to the jury the aggravating circumstance that Reid's murder was committed for pecuniary gain. In support of her motion to dismiss pecuniary gain as an aggravating circumstance, defendant argued this circumstance should be submitted only when the *primary* motivation of defendant is financial gain. This assertion is not supported by the law. Our research reveals no authority and the cases cited by defendant fail to support such an argument.

Rather, "[t]he gravamen of the pecuniary gain aggravating circumstance is that 'the killing was for the purpose of getting money or something of value.'" *State v. Jennings*, 333 N.C. 579, 621, 430 S.E.2d 188, 210 (1993) (quoting *State v. Gardner*, 311 N.C. 489, 513, 319 S.E.2d 591, 606 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985)). This aggravating circumstance considers defendant's motive and is appropriate where the impetus for the murder was the expectation of pecuniary gain. *State v. Taylor*, 304 N.C. 249, 288-89, 283 S.E.2d 761, 785 (1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L. Ed. 2d 1456 (1983). For purposes of determining the sufficiency

of the evidence, the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *State v. Bonney*, 329 N.C. 61, 80, 405 S.E.2d 145, 156 (1991).

The evidence presented at trial tending to show that defendant killed for financial gain includes, but is not limited to, the following: (i) in April of 1986, Reid visited his oldest son, Ray, and stated he had given defendant $10,000 because she was unemployed; (ii) Reid also informed Ray he wanted defendant to receive one-third of his estate should he die; (iii) defendant began telling others she was Reid's fiancee and displayed a family heirloom as an engagement ring; (iv) defendant, during a brief period of improvement in Reid's condition, commented to a nurse that she wanted to take care of Reid's interests and felt his will should be changed naming her as the executrix; (v) defendant contacted an attorney about coming to the hospital to have Reid execute a will; (vi) defendant asked a nurse to recopy a scrap of paper containing notes for the will; (vii) on 2 September 1986, an attorney came to the hospital, reviewed the new will, and executed the will for Reid since, due to his continuing state of paralysis, he was unable to sign his name; (viii) the new will named defendant as the executrix, gave her power of attorney and left her a one-third share of the estate; (ix) after Reid's death, defendant took Reid's sons to the bank to close out his account and told bank personnel that Reid was "doing fine"; (x) defendant told Reid's sons that since she was the executrix of their father's estate, she was entitled to one-third of the insurance proceeds; (xi) each of Reid's sons paid her a portion of their proceeds from the life insurance, representing her alleged one-third share, even though Reid had never changed the beneficiary designation to include her; (xii) Reid's sons later contacted the attorney for the estate and learned they were not obligated to share the insurance proceeds with defendant; (xiii) defendant refused to return the money the boys had shared with her; and (xiv) defendant received $45,384 from the insurance policy plus her distribution from the estate, all as a direct result of Reid's death. In our view, this evidence would permit a rational juror to find beyond a reasonable doubt that Reid's murder was committed for the purpose of pecuniary gain. *Cf., e.g., State v. Barfield*, 298 N.C. 306, 311-12, 259 S.E.2d 510, 519-20 (1979) (holding that evidence that defendant feared her boyfriend would learn she had forged his name on checks and turn her in to the law was sufficient

to support the jury's finding that defendant poisoned her boyfriend for pecuniary gain), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L. Ed. 2d 1181 (1980). This assignment of error is without merit.

[22] Defendant next contends the trial court erred in submitting to the jury the aggravating circumstance that the murder of Reid was "especially heinous, atrocious or cruel." Defendant asserts that the rationale underlying this Court's decision in *State v. Cherry*, 298 N.C. 86, 257 S.E.2d 551 (1979), *cert. denied*, 446 U.S. 941, 64 L. Ed. 2d 796 (1980), should be applied. In *Cherry* we held that in felony-murder cases, the underlying felony could not be submitted as an aggravating circumstance to aggravate a defendant's sentence for first-degree murder. The reasoning of the decision is that the underlying felony becomes an element of the capital murder; and since a defendant convicted of felony murder would always have an aggravating circumstance pending under N.C.G.S. § 15A-2000(e)(5), the possibility exists that a defendant convicted of felony murder would be more likely to be sentenced to death than a defendant convicted on the basis of premeditation and deliberation.

In the present case defendant argues that since arsenic has an inherent propensity to inflict a prolonged and painful period of suffering prior to death, the jury should not be allowed to consider the especially heinous, atrocious, or cruel aggravating circumstance when poison was the method used to murder. At trial defendant did not argue this basis for not submitting the especially heinous, atrocious, or cruel aggravating circumstance and has, therefore, failed to preserve this issue for appeal. *See State v. Robbins*, 319 N.C. 465, 495-96, 356 S.E.2d 279, 297-98 (holding that where the theory had not been presented to the trial court and was being raised for the first time on appeal, it was not properly before the appellate court), *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987). Nevertheless, in light of our inherent authority to suspend the rules in order "to prevent manifest injustice to a party," N.C. R. App. P. 2, we have elected to review defendant's argument.

The holding in *Cherry* is specifically confined to felony-murder cases and the rationale of the case is not applicable to poisoning deaths. Poisoning is the element of the offense of first-degree murder perpetrated by means of poisoning. N.C.G.S. § 14-17 (1993). The act of poisoning itself makes the killing first-degree murder. *Id.*

The fact that the poison is administered in small doses over an extended period of time thereby causing excruciating and prolonged pain and suffering is not essential to prove the offense. Nor is the type poison chosen, be it a slow acting or fast acting agent, an element of the offense. Accordingly, we decline to extend the holding in *Cherry* to murder by poisoning.

Having so held, we conclude that this aggravating circumstance was properly submitted.

> "While we recognize that every murder is, at least arguably, heinous, atrocious, and cruel, we do not believe that this subsection is intended to apply to every homicide. By using the word 'especially' the legislature indicated that there must be evidence that the brutality involved in the murder in question must exceed that normally present in any killing before the jury would be instructed upon this subsection."

*State v. Oliver*, 302 N.C. 28, 59, 274 S.E.2d 183, 203 (1981) (quoting *State v. Goodman*, 298 N.C. 1, 24-26, 257 S.E.2d 569, 585 (1979)). The evidence heretofore summarized depicts a pitiless murder perpetrated over a period of ten months during which the deceased suffered prolonged physical agony including swelling, paralysis, skin splitting, loss of speech, and multiple systems failure necessitating intrusion into his body with tubes and paraphernalia. As defendant stated in her brief, "Reid was subjected to a debilitating, lingering and painful illness before he finally died in North Carolina Baptist Hospital." Based on the evidence in the record before this Court, we are satisfied this aggravating circumstance was properly submitted to the jury. This assignment of error is overruled.

Next, defendant contends the trial court erred by imposing a sentence of death not supported by the evidence. Defendant's argument is based on a contention that one or both of the aggravating circumstances were improperly submitted to the jury. However, as we have noted, the trial court properly submitted the aggravating circumstances that the murder was committed for pecuniary gain and was especially heinous, atrocious, or cruel. This assignment of error is overruled.

PROPORTIONALITY

[23] Having found no error in defendant's trial and capital sentencing proceeding, we are next required by statute to review the entire record and determine (i) whether the record supports the

jury's finding the aggravating circumstances on which the court based its sentence of death; (ii) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (iii) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant. N.C.G.S. § 15A-2000(d)(2) (1988); *State v. McCollum*, 334 N.C. 208, 239, 433 S.E.2d 144, 161 (1993); *State v. Robbins*, 319 N.C. 465, 526, 356 S.E.2d 279, 315, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987).

The jury found in aggravation (i) that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6), and (ii) that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9). We have held the evidence supports the jury's finding both of these aggravating circumstances. Having thoroughly reviewed the record, transcripts, and briefs submitted by the parties, we also find nothing to suggest that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Finally we must determine "whether the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant." *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983). In conducting this proportionality review, we compare similar cases in a pool consisting of

*all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*Id.* Only cases found to be free of error in both the guilt-innocence and penalty phases are included in the pool, but the Court is not bound to give a citation to every case in the pool of similar cases. *State v. Syriani*, 333 N.C. 350, 400, 428 S.E.2d 118, 146 (1993), *cert. denied*, --- U.S. ---, 126 L. Ed. 2d 341 (1993), *reh'g denied*, --- U.S. ---, 126 L. Ed. 2d 707 (1994).

In essence, our task on proportionality review is to compare the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and the defendant's character, background, and physical and mental condition.

*State v. McCollum*, 334 N.C. 208, 239, 433 S.E.2d 144, 161 (1993) (quoting *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985)). When our review reveals that juries have consistently returned death sentences in those similar cases, a strong basis exists for concluding that the death sentence under consideration is not excessive or disproportionate. However, when juries have consistently returned life sentences in the similar cases, a strong basis exists for concluding that the sentence under consideration is excessive or disproportionate. *State v. Syriani*, 333 N.C. 350, 401, 428 S.E.2d 118, 146.

Significant characteristics of defendant's case include (i) the murder of her fiance which the jury found to be for pecuniary gain; (ii) skillful execution of a systematic plan, requiring advance preparation, to poison the victim repeatedly; (iii) substantial evidence that defendant used the same means and method to murder her first husband and to attempt to murder her second husband; (iv) the conscienceless and pitiless vigil of Reid's indescribable physical agony for the ten months leading to his death which the jury found to be especially heinous, atrocious, or cruel; and (v) knowledge that she, and she alone, could prevent her victim's death.

No statutory mitigating circumstances were submitted to the jury. In mitigation, the jury considered fifteen nonstatutory mitigating circumstances but deemed only three to exist and have mitigating value. These three included (i) upon being informed of the warrant for her arrest, defendant peacefully submitted herself in conformance with her duty; (ii) defendant demonstrated concern and kindness for others in her community; and (iii) defendant provided well for the needs of her children while they were growing up. The value of these mitigating circumstances in assessing defendant's culpability for the crime is minimal.

STATE v. MOORE

[335 N.C. 567 (1994)]

This Court has found the death penalty to be disproportionate on seven occasions.[3] Only two of these seven cases involved the "especially heinous, atrocious, or cruel" aggravating circumstance. *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983). These two cases are not similar to the instant case. Of the remaining five cases, in only one, *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985), did the jury find multiple aggravating circumstances. In finding the death sentence in *Young* to be disproportionate, this Court focused on the jury's failure to find either that the murder was committed as part of a course of conduct which included the commission of violence against another person or persons or that the crime was especially heinous, atrocious, or cruel. *McCollum*, 334 N.C. at 241, 433 S.E.2d at 162.

Significant dissimilarities between this case and *Stokes* include that (i) defendant Stokes was convicted on a felony-murder theory; defendant Moore was convicted of murder by poisoning; (ii) defendant Stokes was seventeen years old; defendant Moore was fifty-three years old; and (iii) in *Stokes* there was substantial mitigating evidence that defendant suffered from impaired capacity to appreciate the criminality of his conduct and that he was under the influence of a mental or emotional disturbance at the time of the murder; in the present case the jury found no statutory mitigating circumstances and only three nonstatutory mitigating circumstances.

Significant dissimilarities between this case and *Bondurant* include that (i) the jury in *Bondurant* found in aggravation of the murder only that the crime was especially heinous, atrocious, or cruel; in this case the jury also found that the murder was committed for pecuniary gain; and (ii) defendant Bondurant immediately exhibited remorse and concern for the victim's life by helping him get medical treatment; whereas, defendant Moore showed no sign of remorse or regret as she watched and anticipated the effects of the deadly poison she had administered to the man whom she was engaged to marry. Moreover, the facts in *Bondurant*

3. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

STATE v. MOORE

[335 N.C. 567 (1994)]

"demonstrate that defendant did not coldly calculate the commission of this crime for a long period of time as did the defendant in *State v. Barfield*, 298 N.C. 306, 259 S.E.2d 510 (1979), *cert. denied*, 448 U.S. 907, *reh'g denied*, 448 U.S. 918 (1980)." *State v. Bondurant*, 309 N.C. at 693, 309 S.E.2d at 182.

The most analogous case for comparison to this case in terms of the crime committed is *State v. Barfield*, 298 N.C. 306, 259 S.E.2d 510 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied*, 448 U.S. 918, 65 L. Ed. 2d 1181 (1980).[4] In *Barfield*, the defendant, a middle-aged woman, poisoned her boyfriend, Stewart Taylor, by placing arsenic in his tea and beer out of fear he would "turn her in" to law enforcement officials for forging checks to herself on his checking account. Evidence was introduced showing that Barfield also poisoned others to death. In aggravation, the jury found that (i) the murder of Stewart Taylor was committed for pecuniary gain; (ii) the murder of Stewart Taylor was committed to hinder the enforcement of the law; and (iii) the murder was especially heinous, atrocious, or cruel. During defendant Moore's sentencing hearing, the jury found two of these same aggravating circumstances to exist. In *Barfield*, the jury rejected the two statutory mitigating circumstances that (i) the murder was committed while Barfield was under the influence of mental or emotional disturbance; and (ii) Barfield's capacity to appreciate the criminality of her conduct or to conform her conduct to the requirements of the law was impaired. In defendant Moore's sentencing hearing, no statutory mitigating circumstances were even submitted to the jury. The jury found only three nonstatutory mitigating circumstances with minimal mitigating effect.

In reviewing *Barfield*, this Court stated:

The manner in which death was inflicted and the way in which defendant conducted herself after she administered the poison to Taylor leads us to conclude that the sentence of death is not excessive or disproportionate considering both the crime and the defendant.

---

4. In *State v. Detter*, 298 N.C. 604, 260 S.E.2d 567 (1979), this Court concluded that the dates of the murderous acts rather than the date of death were determinative of when the murder was committed. As a result, Rebecca Detter's death sentence was set aside and a life sentence imposed since Detter, in all instances, had administered arsenic poisoning to her husband prior to 1 June 1977, the effective date of N.C.G.S. § 15A-2000 (1978).

*State v. Barfield*, 298 N.C. at 355, 259 S.E.2d at 544. From our comparison of this holding with the instant case, we, likewise, cannot say that the death sentence given defendant Moore was excessive or disproportionate, considering both the crimes and the defendant.

CONCLUSION

We hold that defendant received a fair trial and sentencing proceeding, free from prejudicial error. The death sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. The death sentence imposed is not disproportionate to the penalty imposed in similar cases.

NO ERROR.